## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

PATRICIA GOMEZ                                        CIVIL ACTION

VERSUS                                               No. 08-1489

MONSANTO COMPANY DISABILITY PLAN                     SECTION: I/5
THROUGH MONSANTO COMPANY EMPLOYEE BENEFITS
PLAN COMMITTEE

### ORDER AND REASONS

Before the Court are cross motions for summary judgment
filed by plaintiff, Patricia Gomez ("Gomez"), and defendant,
Monsanto Company Disability Plan through Monsanto Company
Employee Benefits Plan Committee("Monsanto"), with respect to
plaintiff's claim for review, pursuant to the Employee Retirement
Income Security Act ("ERISA"), of defendant's termination of
disability benefits. For the following reasons, defendant's
motion is **GRANTED** and plaintiff's motion is **DENIED.**

### BACKGROUND

Plaintiff began working as a production technician for Monsanto
Company in Luling, Louisiana in February, 1999.[1] Nearly four years
later, plaintiff injured herself, tearing a ligament in her left
ankle.[2]  She underwent ankle reconstruction surgery in February,
2004 and subsequently began physical therapy to help her regain her

_____

[1] Admin Rec. Doc. No. 155.

[2] Admin Rec. Doc. No. 2.

1

balance.[3] On February 2, 2004, a claims examiner for Sedgwick CMS ("Sedgwick") sent plaintiff a letter advising that Sedgwick had begun reviewing her claim for short-term disability benefits under the Monsanto Company Disability Plan ("the Plan").

The Plan, which Monsanto self-funds and third-party Sedgwick administers,[4] offers both short-term and long-term disability benefits.[5] Short-term benefits ("STD") are available for the first twenty-six weeks of disability if Sedgwick determines that the employee is "unable to perform, with or without reasonable accommodation, the essential duties of [the employee's] **OWN OCCUPATION** with Monsanto or a participating employer or any other appropriate job made available to [the employee] by Monsanto or a participating employer based on [the employee's] experience, education, training and background."[6] If the employee remains unable to perform the essential functions of her own occupation beyond twenty-six weeks, long-term benefits (LTD) are available for an additional eighteen months.[7] LTD benefits may extend beyond eighteen months to the time the employee reaches the age of 65 if Sedgwick determines that the employee is "unable to perform, with or without

---

[3]Admin. Rec. Doc. Nos. 3, 12-14.

[4]Admin. Rec. Doc. Nos. 387, 397.

[5]Admin. Rec. Doc. No. 388.

[6]*Id.*(emphasis in original).

[7]*Id.*

reasonable accommodation, **ANY REASONABLE OCCUPATION** for which [the employee is] qualified or may become qualified by virtue of education, training or experience."[8]

Ongoing LTD benefits generally terminate at the time of recovery. However, benefits may also terminate if the employee fails to follow the course of medical treatment prescribed by her own physician, fails to comply with rehabilitation services deemed appropriate by Sedgwick, engages in gainful employment, returns to full-time work, or declines an offer of "appropriate employment based on [the employee's] experience, education, training and background."[9] Also, if the employee "refuse[s] to furnish information or have a medical examination" when required by Sedgwick, the employee is not eligible for disability benefits during the period of non-compliance.[10]

Following plaintiff's injury to her ankle, Sedgwick approved her claim for STD benefits, beginning February 2, 2004.[11] On August 2, 2004, plaintiff became eligible for LTD benefits.[12] On August 9, 2004, plaintiff's treating physician, Dr. Michael Brunet, noted

---

[8]Admin. Rec. Doc. No. 389 (emphasis in original).

[9]Admin. Rec. Doc. No. 391.

[10]Admin. Rec. Doc. No. 393.

[11]Admin Rec. Doc. No. 10.

[12]Admin. Rec. Doc. No. 48.

3

that plaintiff was "[d]oing well."[13] He encouraged her to continue physical therapy, but concluded that she could "return to light duty with certain restrictions."[14] He stated that she could sit 100 percent of the time and could walk 25 percent of the time, but that she could not climb, bend, squat, twist or crawl.[15] Dr. Brunet noted that plaintiff described her job as involving standing, lifting, climbing and using ladders.[16]

Plaintiff subsequently developed vertigo, causing her to temporarily stop physical therapy.[17] On September 8, 2004, Dr. Brunet recommended that she continue physical therapy once her vertigo permitted.[18] On the same date, he concluded that she may work with restrictions.[19] On September 9, 2004, an electronystagmography ("ENG"), performed by Dr. Russell Cecola, indicated that plaintiff had a left peripheral vestibular abnormality.[20] Sedgwick sent plaintiff a letter on September 16, 2004, advising that she may be eligible for LTD benefits.[21] She

---

[13]Admin. Rec. Doc. No. 52.

[14]*Id.*

[15]*Id.*

[16]*Id.*

[17]Admin. Rec. Doc. Nos. 54-58.

[18]Admin. Rec. Doc. No. 54.

[19]Admin. Rec. Doc. No. 59.

[20]Admin. Rec. Doc. No. 55.

[21]Admin. Rec. Doc. No. 62.

returned to physical therapy on September 20, 2004.[22]

Plaintiff's symptoms improved for about five weeks in October and November, 2004.[23] Following a "physician advisor review," Sedgwick determined that there was a "lack of medical necessity to continue [plaintiff's] benefits" and it terminated plaintiff's benefits, effective October 21, 2004.[24] The letter notes that a physician advisor contacted Dr. Brunet and plaintiff's physical therapist before determining that the records do not "support the complete inability to work."[25]

On November 30, 2004, Dr. David Sampognaro diagnosed plaintiff with vertigo, dizziness and giddiness[26] and he continued to diagnose vertigo in January, 2005 and March, 2005.[27] At plaintiff's January

---

[22]Admin. Rec. Doc. No. 68.

[23]Admin. Rec. Doc. Nos. 191, 208.

[24]Admin. Rec. Doc. No. 75.

[25]Admin Rec. Doc. Nos. 75-76. The physician advisor explained that at plaintiff's last visit with Dr. Brunet and prior to the date that plaintiff resumed physical therapy, Dr. Brunet had "a concern about her proprioception" and that Dr. Brunet believed that plaintiff should have "adequate proprioception before being released back to work" due to the "very heavy-duty nature of her job." Admin. Rec. Doc. Nos. 73-74. The physician advisor stated that he then contacted plaintiff's physical therapist who indicated that plaintiff had one more physical therapy visit scheduled and that plaintiff's proprioception "had returned to almost normal," leading the physician advisor to conclude that plaintiff could go return to her regular job. *Id.* The physician advisor also stated that discussion with Dr. Brunet indicated her proprioception was "close to normal" and that he was going to release her to work. *Id.*
The Court notes that the letter refers to "Short-Term Disability benefits." However, at this time, plaintiff had been receiving LTD benefits. Because plaintiff had not been receiving LTD benefits for more than eighteen months, the definition of disability is the same for LTD benefits and STD benefits

[26]Admin. Rec. Doc. No. 86.

[27]Admin. Rec. Doc. Nos. 97, 99, 114.

25, 2005 visit, Dr. Sampognaro referred her to a neurologist for evaluation of her recurrent dizziness.[28]

A neurologist, Dr. L. Jay Turkewitz, examined plaintiff on February 11, 2005, noting an abnormal ENG and diagnosing plaintiff with vertigo and dizziness.[29] Dr. Turkewitz prescribed Valium and cautioned plaintiff that the medication may cause drowsiness, particularly when driving.[30] On March 15, 2005, Dr. Turkewitz reported to Sedgwick that plaintiff could not return to work due to dizziness.[31] Dr. Turkewitz evaluated plaintiff again on March 16, 2005 and noted plaintiff's complaint that the Valium caused her to become sleepy. Dr. Turkewitz cautioned her against driving due to the effects of Valium.[32]

Sedgwick sent a letter to plaintiff, dated March 16, 2005, advising she may be eligible for LTD benefits following her submission of certain documents.[33] Sedgwick reinstated LTD benefits on March 21, 2005.[34]

Plaintiff's complaints of dizziness continued. On June 13, 2005 a neurologist, Dr. Timothy Molony, evaluated plaintiff. He concluded

---

[28]Admin. Rec. Doc. No. 102.

[29]Admin. Rec. Doc. Nos. 128-130.

[30]Admin. Rec. Doc. No. 131.

[31]Admin. Rec. Doc. No. 128.

[32]Admin. Rec. Doc. No. 165.

[33]Admin. Rec. Doc. No. 132.

[34]Admin. Rec. Doc. No. 157.

that plaintiff had "a vestibulopathy of unknown etiology with poor compensation" and he prescribed physical therapy and oral medication.[35] He further advised Sedgwick on June 20, 2005 that plaintiff could return to work on July 13, 2005.[36] However, Dr. Sampognaro notified Sedgwick on July 11, 2005 that plaintiff could not return to work.[37]

Dr. Thomas Irwin evaluated plaintiff on July 27, 2005 based on another a referral from Dr. Sampognaro. Dr. Irwin noted plaintiff's left peripheral vestibular abnormality as indicated by the September, 2004 ENG and opined that she might have Meniere's Syndrome. Dr. Irwin prescribed medication and advised plaintiff to avoid caffeine.[38]

On August 18, 2005, Sedgwick obtained an independent medical evaluation ("IME") of plaintiff by a neurologist, Dr. D.C. Mohnot.[39] Dr. Mohnot noted that plaintiff had vertigo, dizziness, and impairment of memory.[40] In response to Sedgwick' questions, Dr. Mohnot advised that plaintiff was not capable of performing her regular job, noting that she is restricted from climbing ladders or

---

[35]Admin. Rec. Doc. No. 185.

[36]Admin. Rec. Doc. No. 158.

[37]Admin. Rec. Doc. No. 189.

[38]Admin. Rec. Doc. Nos. 191-194.

[39]Admin. Rec. Doc. Nos. 208-211.

[40]*Id.*

stairs, bending down, operating heavy machinery, or picking up heavy objects.[41] In response to questions submitted by Sedgwick, Dr. Mohnot responded on October 23, 2005 that while plaintiff is unable to climb, lift, drive, look up or down, or perform more than one task at a time, she may be able to perform sedentary work, such as secretarial work.[42]

In light of plaintiff's perceived memory impairment, Dr. Mohnot recommended neuropsychological testing during his August, 2005 evaluation and in connection with his opinion that she could perform secretarial work.[43] Pursuant to an IME request by Sedgwick, Dr. William Black, a neuropsychologist, evaluated plaintiff in January, 2006. Following memory tests, Dr. Black assessed plaintiff's memory function level as varying between average and superior and concluded that she had a "intact and normal memory test performance."[44] He also concluded that she had "a normal pattern of attention and concentration" and "intact high order logical analysis, problem solving, and executive function."[45]

Sedgwick also requested an IME by a psychiatrist, Dr. Harminder

---

[41]*Id.*

[42]Admin. Rec. Doc. No. 213.

[43]*Id.*; Admin. Rec. Doc. No. 211.

[44]Admin. Rec. Doc. No. 238.

[45]Admin. Rec. Doc. No. 239.

Mallik. Dr. Mallick concluded after a February 15, 2006 evaluation[46] that plaintiff did "not suffer from any psychiatric disorder that would preclude her from returning to work."[47] He noted, however, that all of the physicians agree that she suffers from vestibulopathy of unknown etiology, a variant of Meneire's Syndrome or viral vestibular neuritis, causing her symptoms of vertigo, dizziness, ataxia, and disequilibrium and that all of her treating physicians agree that she cannot return to work "in her previous capacity."[48] Dr. Mallik stated that he agreed that plaintiff was "not capable of performing her regular job" at the time, but he deferred any decisions regarding her return to work to plaintiff's treating physicians.[49]

Following a May 23, 2006 evaluation, Dr. Irwin advised Sedgwick that plaintiff could return to work despite her "dizzy" condition.[50]

---

[46]Sedgwick temporarily terminated plaintiff's LTD benefits on the ground that she failed to attend two appointments with Dr. Mallick. *See* Admin. Rec. Doc. No. 393 ("If you refuse to furnish information or have a medical examination when required, you cease to be eligible for disability payments for the period of such refusal or failure."). Plaintiff attended the first appointment on January 19, 2006, but she left after learning that the evaluation would take longer than expected. Admin. Rec. Doc. Nos. 266, 269. Sedgwick rescheduled the appointment for January 25, 2006.Admin. Rec. Docs. No. 229-230. Plaintiff alleges that she attended the second appointment. However, there is no such evidence in the administrative record and correspondence in the record indicates otherwise. Rec. Doc. Nos. 226-227, 265. Accordingly, Sedgwick notified plaintiff on February 2, 2006 that her claim for LTD benefits has been denied and that her claim would be reconsidered if she attended a February 15, 2006 appointment. Admin. Rec. Doc. No. 247.

[47]Admin Rec. Doc. No. 262.

[48]*Id.*

[49]*Id.*

[50]Admin. Rec. Doc. Nos. 275-76.

However, he noted the following restrictions: "[n]o ladders, exposed machinery, operation [of a] vehicle."[51]

Another neurologist, Dr. Daniel Trahant, evaluated plaintiff on November 16, 2006. Dr. Trahant noted plaintiff's diagnosis as vestibular dysfunction and informed Sedgwick that plaintiff could return to work with certain restrictions.[52]

Meanwhile, Sedgwick also requested a vocational analysis from a company named GENEX. On June 1, 2006 GENEX submitted a transferable skills analysis to Sedgwick. Based on plaintiff's statement regarding her training, education, and experience, certain medical reports from Dr. Brunet and Dr. Irwin, a GENEX disability consultant identified alternative occupations for plaintiff within 27 miles of her home in Luling, Louisiana.[53]

Sedgwick then directed plaintiff to attend vocational rehabilitation appointments with a rehabilitation counselor. Plaintiff met with a rehabilitation counselor several times between June, 2006 and December, 2006.[54] At plaintiff's first meeting, and again on October 5, 2006, she signed a form stating that she agreed to: participate in job search activities for four to six hours per day, five days per week; submit one to three applications daily with

---

[51]*Id.*

[52]Admin. Rec. Doc. No. 326.

[53]Admin. Rec. Doc. No. 278.

[54]Admin. Rec. Doc. Nos. 282–351, 362

at least ten in-person employer contacts per week; maintain a daily record of job activities; register with the local job service office and visit the office once a week to check on available jobs; follow up on all job leads furnished by the rehabilitation counselor; and maintain contact with the rehabilitation counselor.[55] Both forms note potential limitations on plaintiff due to her inability to drive.[56]

The rehabilitation counselor identified available jobs in New Orleans, Louisiana, Kenner, Louisiana and Metairie, Louisiana[57] and plaintiff submitted logs of her efforts to apply for jobs.[58] On October 16, 2006, the rehabilitation counselor notified Sedgwick by email that plaintiff failed to register with the local job service office or submit applications with temporary staffing agencies during the previous week and that he had encouraged her to do so

---

[55]Admin. Rec. Doc. Nos. 284, 301.

[56]*Id.* ("Availability to make in-person contacts may be limited by client's inability to drive.").

[57]Admin. Rec. Doc. Nos. 296-342. The rehabilitation counselor identified jobs on multiple occasions in September, 2006, October, 2006, and November, 2006.

[58]An October 6, 2006 email from Randolph states that plaintiff submitted a journal documenting her job search efforts. Admin. Rec. Doc. No. 299. Copies of the journal are not included in the administrative record.
Records from October 9, 2006 to November 3, 2006 indicate that plaintiff sent her resume to thirty-five employers by the mail or the Internet. Her log indicates that, on average, she applied for one to two jobs a day, five days a week. Admin. Rec. Doc. Nos. 306-12, 343-48. There is no indication, however, that she applied for any jobs after November 3, 2006. Every entry that follows, from November 15, 2006 to November 29, 2006, lists only addresses or telephone numbers, without any notation as to whether plaintiff applied for open positions or contacted the employers. Admin. Rec. Doc. Nos. 346-48.

before their next meeting.[59]

On February 14, 2007, Sedgwick sent plaintiff a letter, informing her that she did not qualify for ongoing LTD benefits due to her failure "to comply with the rehabilitation services deemed appropriate by Sedgwick."[60] Sedgwick's letter restates the agreement that she made with respect to her job search efforts.

Plaintiff appealed the decision on June 15, 2007. Sedgwick's appeal board upheld the denial of benefits, stating that she "was persistently reticent in meeting the requirements of the benefit plan and treatment follow through" and that she "entered into job search agreements and did not complete the plan requirements relative to her job search."[61] The appeals specialist noted that she failed to meet the job search requirements for nine months.[62]

Plaintiff appealed a second time on August 6, 2007 on the ground that she is disabled.[63] She sent a letter to Sedgwick, stating that the Social Security Administration deemed her disabled, finding that she could not perform any type of work.[64] On September

---

[59]Admin. Rec. Doc. Nos. 305, 308.

[60]Admin. Rec. Doc. No. 352.

[61]Admin. Rec. Doc. No. 357.The letter erroneously refers to "Short-Term Disability benefits."

[62]*Id.* He also noted that she has a real estate license and "admits that she is doing real estate in her spare time."

[63]Admin. Rec. Doc. Nos. 361-69.

[64]Her letter further states that a Monsanto nurse informed her that there was an available job, scanning files, but that she could not obtain the job without a doctor's determination that she could drive, that the job search

21, 2007, Sedgwick notified plaintiff that the appeals board had upheld the denial of LTD benefits.[65] The letter states that she was denied LTD benefits because she was not determined to be disabled "under the 'any occupation' definition of LTD review."[66] The letter further explains that although plaintiff cannot perform "her previous occupational assignment," she can return to "sedentary to light occupational activities with the restrictions provided by her treating physician of no ladders, exposed machinery or operating a vehicle."[67]

Plaintiff filed a complaint in this Court on April 2, 2008, seeking review pursuant to ERISA. Plaintiff's complaint alleges that she is "totally disabled."[68] Plaintiff's complaint further contends that Monsanto "breached its fiduciary responsibilities under ERISA by failing to make a good faith investigation of [plaintiff's] claim and to make a reasonable determination concerning the extent of her disability and by basing the denial of benefits, in part, on her alleged failure to participate in a job search which was no more

---

requirements were "ridiculous" and "unobtainable," and that the rehabilitation counselor did not contact her after December, 2006. She also denied that she was selling real estate. Admin. Rec. Doc. No. 361.

[65]Admin. Rec. Doc. No. 381. The first paragraph of the letter denying plaintiff's appeal refers to and defines "Short-Term Disability benefits." However, the letter's explanation of the denial correctly refers to and defines LTD benefits.

[66]*Id.*

[67]*Id.*

[68]Rec. Doc. No. 1.

than "sham rehabilitation/placement."[69]

The parties subsequently filed cross motions for summary judgment with respect to the termination of plaintiff's disability benefits.

## LAW AND ANALYSIS

### I. STANDARD OF LAW

#### A. SUMMARY JUDGMENT

Summary judgment is proper when, after reviewing "the pleadings, the discovery and disclosure materials on file, and any affidavits," the court determines there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 266, 274 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553, 91 L. Ed. 2d at 274; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986). Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there

---

[69]*Id.*

is a genuine issue of material fact for trial. *Matsushita Elec.*
*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct.
1348, 1356, 89 L. Ed. 2d 538, 552 (1986).


**B. STANDARD OF REVIEW UNDER ERISA**

ERISA provides that when an administrator of an employee
benefit plan has denied benefits to a claimant, the claimant may
file a lawsuit in federal district court "to recover benefits due
to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B);
*Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 394 (5th Cir. 1998);
*see Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 295 (5th
Cir. 1999) (en banc)("ERISA provides the federal courts with
jurisdiction to review determinations made by employee benefit
plans"). Administrators of an employee benefit plan must make two
decisions in determining whether to pay or deny benefits: "'First,
he must determine the facts underlying the claim for
benefits...Second, he must determine whether those facts constitute
a claim to be honored under the *terms* of the plan.'" *Schadler*, 147
F.3d at 394 (quoting *Pierre v. Conn. Gen. Life Ins. Co./Life Ins.*
*Co. Of N. Am.*, 932 F.2d 1552, 1557 (5th 1991)). Therefore, the
district court reviews two elements of the benefit determination-the
factual findings of the administrator and the administrator's
interpretation of the ERISA governed policy. *Green v. Prudential*
*Ins. Co. of America*, No. 04-3101, 2005 WL 2036788, at *5 (E.D. La.

Aug. 5, 2005) (Fallon, J.).[70]

An administrator's factual determinations underlying a decision to deny benefits are entitled to deference and are reviewed for an abuse of discretion. *Schadler*, 147 F.3d at 395. 932 F.2d 1552, 1562 (5th Cir. 1991). Additionally, "when assessing factual questions, the district court is constrained to the evidence before the plan administrator."[71] While the Fifth Circuit has recognized some exceptions to this rule, it has also held that "the district court is precluded from receiving evidence to resolve disputed material facts." *Id.*

A plan administrator's "construction of the meaning of plan terms and plan benefit entitlement provisions is reviewed *de novo* unless there is an express grant of discretionary authority in that respect," in which case the review of those decisions is for abuse

---

[70]The Fifth Circuit has explained the analytic methodology applicable to ERISA cases as follows:

> In sum, ERISA and its regulations contemplate a system in which the administrator makes a decision as to whether to grant or deny benefits based on the factual scenario and based on its interpretation of the relevant plan provisions . . . . If the administrator denies benefits, the claimant may bring suit under § 1132. The district court will then engage in a deferential review of the administrator's factual determinations, based on the record before the administrator. Next, depending on whether the plan expressly grants the administrator discretion in interpreting its terms, the reviewing court will review the administrator's interpretation of the plan provisions either under a de novo or an abuse of discretion standard.

*Schadler*, 147 F.3d at 395.

[71] The Fifth Circuit recognizes limited exceptions to this rule. "To date, those exceptions have been related to either interpreting the plan or explaining medical terms and procedures relating to the claim. Thus, evidence related to how an administrator has interpreted terms of the plan in other instances is admissible." *Vega*, 188 F.3d at 299.

16

of discretion. *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 226 (5th Cir. 2004).

"Abuse of discretion is synonymous with arbitrary and capricious review in the ERISA context." *Dramse v. Delta Family-Care Disability & Survivorship Plan*, 269 F. App'x 470, 478 (5th Cir. 2008)(citing *Lain v. UNUM Life Ins. Co.*, 279 F.3d 337, 342 (5th Cir. 2002)). "A decision is arbitrary only if 'made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Meditrust Fin. Servs. Corp. V. Sterling Chemicals, Inc.*, 168 F.3d 211, 215 (5th Cir. 1999). If the district court finds that the administrator's decision "is supported by substantial evidence and is not arbitrary and capricious, it must prevail." *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 273 (5th Cir. 2005). "Substantial evidence" is "'more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*(quoting *Deters v. Sec. of Health, Educ. & Welfare*, 789 F.2d 1181, 1185 (5th Cir. 1986)).

The Fifth Circuit has set forth a two-step methodology for testing a plan administrator's interpretation of a plan for abuse of discretion. *Vercher*, 379 F.3d at 227. Under such an analysis, the court first determines the legally correct interpretation of the plan and "whether the administrator's interpretation accords with

the proper legal interpretation." *Id.*[72] "If the administrator's construction is legally sound, then no abuse of discretion occurred and the inquiry ends." *Id.* However, if the administrator has not given the plan the legally correct interpretation, the court must then determine whether the administrator's interpretation constitutes an abuse of discretion. *Id.* at 227-28. To determine whether an abuse of discretion has occurred, the Fifth Circuit has identified four factors: (1) the plan's internal consistency under the administrator's interpretation, (2) any relevant regulations, (3) the factual background underlying the decision, and (4) any indication of lack of good faith. *Lain*, 279 F.3d at 346.

## II. <u>DISCUSSION</u>

Plaintiff contends that Sedgwick's decision to terminate her LTD benefits was arbitrary and capricious in light of evidence that her vertigo impaired her ability to work and drive. Monsanto claims that the denial was reasonably supported by evidence that plaintiff was able to perform another "reasonable occupation," indicating that she no longer qualified for ongoing LTD benefits under the Plan's definition of disability.

The parties agree that the Plan confers "discretionary authority" upon the administrator to interpret the terms of the Plan

---

[72]In order to determine the legally correct interpretation of the plan, a court must consider: (1) the uniformity of the plan administrator's interpretation; (2) whether that interpretation is consistent with a fair reading of the plan; and (3) any unanticipated costs resulting from different interpretations of the plan. *Id.* at 228.

and to determine an employee's eligibility for benefits and that such authority limits this Court's review to whether the administrator abused its discretion.[73] However, plaintiff argues that the Court should afford less deference in light of a conflict of interest that arises because Monsanto self-funds the Plan and a Monsanto claims committee acts as plan administrator.

Less deference is appropriate if a conflict of interest exists. *Vega*, 188 F.3d at 296. Indeed, the "greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be." *Id.* at 297.

However, the Court is not convinced that a conflict of interest exists in this case. Unlike cases where "the plan fiduciary serves as both the administrator and insurer," the Plan is self-funded by Monsanto and administered by a third-party, Sedgwick. *See Schexnayder v. CF Indus. Long Term Disability Plan For Its Employees*, 553 F. Supp. 2d 658, 663 (M.D. La. 2008); *Vega*, 188 F.3d at 295.[74] Monsanto contends that although the Monsanto Company Employee Benefits Plans Committee is designated as the administrator, Sedgwick has "the **sole** responsibility for making all

---

[73]The Plan provides: "The plan administrator or other person designated by the plan administrator has the discretionary authority to interpret all Plan provisions, and determine whether a participant or beneficiary is entitled to any benefit pursuant to the terms of the Plan." Admin. Rec. Doc. No. 399.

[74] The instant case is distinguishable from the cases cited by plaintiff where an insurer acted as both the decision-maker and payor. *See Calvert v. Firstar Fin., Inc.,* 409 F.3d 286, 292 (6th Cir. 2005); *see also Smith v. Continental Cas. Co.*, 450 F.3d 253, 260 (6th Cir. 2006) ("In considering such a conflict, there must be significant evidence in the record that the insurer was motivated by self-interest....").

benefits determinations."[75] Indeed, Sedgwick rendered all decisions at dispute in this matter, including initial denials and following appeals. As such, the Court finds no conflict of interest compelling a less deferential review and the Court will, therefore, consider whether Sedgwick's decision was arbitrary and capricious.[76]

## A. **Failure to Comply With Rehabilitative Services**

In a February, 2007 letter, Sedgwick notified plaintiff that her claim for LTD benefits was denied due to her failure to participate in rehabilitative services deemed appropriate by Sedgwick. Sedgwick listed all job search efforts plaintiff agreed to make during her meetings with the rehabilitation counselor and

---

[75]Rec. Doc. No. 29, p. 2 (emphasis in original). There appears to be some confusion because the Plan states that the "Plan Administrator is the Monsanto Company Employee Benefits Plans Committee." Admin. Rec. Doc. No. 397. However, the Plan further provides that "Monsanto has entered into a contract with Sedgwick CMS...who administers the Plan." Admin. Rec. Doc. No. 397. Additionally, the Plan directs claimants to submit their claims and their appeals, unless relating to their eligibility as an employee, to Sedgwick. *Id.*

[76]Plaintiff directs the Court to a Plan provision which states:
> Sedgwick CMS will contact your personal physician, supervisor and/or the location's medical staff (if applicable), if the injury or illness is not work-related.
> From these conversations–and working with you–Sedgwick CMS will establish an approved length-of-disability period to make sure you receive all the disability benefits for which you are eligible. Sedgwick CMS will also work with you, your supervisor and the location medical staff (if applicable) to determine if light duty, part-time duty or rehabilitative work is appropriate.
> Admin. Rec. Doc. No. 392.

Plaintiff contends that this provision indicates that a Monsanto supervisor and Monsanto medical staff will be included in the decision-making. However, the Court is not persuaded that Sedgwick's mere contact with Monsanto representatives demonstrates a conflict of interest. Indeed, the provision states that Sedgwick will also contact the employee's personal physician. The provision further provides that in determining whether light duty is appropriate, Sedgwick will work not just with the employee's supervisor, but also with the employee.

stated that "[f]or the last nine months, you have failed to do this."[77]

The Plan specifically identifies a failure to cooperate with rehabilitative services as a basis for terminating ongoing LTD benefits. The Plan provides: "Long-Term benefits can also stop if you: fail to follow the course of medical treatment prescribed by your personal physician or fail to comply with rehabilitation services deemed appropriate by Sedgwick CMS."[78]

Plaintiff does not appear to contest Sedgwick's interpretation of this provision. Instead, plaintiff claims that Sedgwick disregarded medical evidence that she could not drive and this inability made the requirement of ten in-person contacts per week "impossible."[79] She also argues that her inability to drive affected her follow-up with and her application to jobs identified by the rehabilitation counselor because the jobs were all located in Metairie, Kenner, Belle Chase, and New Orleans.

Monsanto responds that there is no evidence that plaintiff was unable to drive. At least two physicians noted driving or operating vehicles as one of plaintiff's restrictions.[80] On February 11, 2005,

---

[77]Admin. Rec. Doc. No. 352.

[78]Admin. Rec. Doc. No. 391.

[79]Rec. Doc. No. 18-4, p. 16.

[80]There is a lack of evidence in the administrative record to clearly indicate whether the driving restriction relates to a complete inability to drive or whether the physicians only intended to identify driving as a work-related restriction. Dr. Mohnot advised that plaintiff "is unable to perform activities such as...driving...." Admin. Rec. Doc. No. 213. Dr. Irwin listed "operation [of

another physician cautioned plaintiff against driving while taking her Valium prescription.[81] Plaintiff later informed a psychiatrist on February 15, 2006 that she had stopped taking Valium.[82]

Even if plaintiff could not drive herself to work or drive herself to meet in person with ten employers, Sedgwick's decision was not arbitrary and capricious. First, it was not unreasonable for Sedgwick to assume that plaintiff could find ways to arrive at work and make in-person contacts other than by driving herself.[83] Furthermore, the Court is not convinced that Sedgwick terminated plaintiff's benefits solely because she did not make ten in-person contacts a week. The denial letter does not focus on her failure to

a] vehicle" as one of the restrictions on plaintiff's return to modified work. Admin. Red. Doc. No. 275. It is apparent to the Court that if plaintiff's vertigo precludes her ability to operate a vehicle in connection with her work, then she likely cannot drive a vehicle at all, including to and from work. It is evident that these medical opinions also led Sedgwick to have significant questions as to plaintiff's general ability to drive. On June 19, 2006, Sedgwick sent Dr. Irwin a facsimile, inquiring whether the restriction of "operation of a vehicles mean [sic] no driving on the job OR does it mean no driving to and from a job." Admin. Rec. Doc. No. 286. There is no response in the administrative record. The Court notes that plaintiff's benefits continued for several months.

[81]Admin. Rec. Doc. No. 131.

[82]Admin. Rec. Doc. No. 256.

[83]As argued by Monsanto, the Court may not consider plaintiff's affidavit with respect to public transportation in Luling, Louisiana, where she resides, but the administrative record includes a letter from plaintiff to Sedgwick, stating that "there's no public transportation." Admin. Rec. Doc. No. 362. However, there is no indication in the administrative record, including in plaintiff's letter appealing the denial, that no one else could drive her to make her in-person contacts or that she could not rely on a taxi service. See id. Moreover, plaintiff, herself, did not limit her job search to positions near her home in Luling, Louisiana. Her log indicates that she applied for jobs in New Orleans, Metairie, and Kenner.

The administrative record indicates that Sedgwick did not disregard plaintiff's limitation. Comments made by the rehabilitation counselor on June 14, 2006, and included in the administrative record, indicate that "[a]vailability to make in-person contacts may be limited by client's inability to drive." Admin. Rec. Doc. No. 284.

fulfill this one requirement. Instead, the denial letter identifies all of the job search requirements and states that "[f]or the last nine months, [plaintiff] failed to do this."[84] The appeals board found plaintiff was "persistently reticent in meeting the requirements of the benefit plan and treatment follow through."[85]

Plaintiff does not argue that she fulfilled the other requirements or that her condition somehow precluded her from submitting applications five days a week through the mail or Internet, visiting the local job service office once a week, keeping a detailed record of employer contacts, or following up on job leads. Indeed, the administrative record indicates that the rehabilitation counselor advised Sedgwick that plaintiff failed to register with the job service office[86] and her employer contact log does not indicate that she submitted any job applications after November 3, 2006.[87] Plaintiff's log of her efforts from November 15, 2006 to November 29, 2006 merely lists addresses without any indication as to whether plaintiff applied for any available jobs.[88]

Sedgwick's decision certainly comes within the terms of the Plan and there is a rational connection between the found facts and

---

[84]Admin. Rec. Doc. No. 352.

[85]Admin. Rec. Doc. No. 358.

[86]Admin. Rec. Doc. No. 305.

[87]Admin. Rec. Doc. Nos. 345-348. The Court notes that plaintiff continued to meet with the rehabilitation counselor in December, 2006.

[88]*Id.*

this denial. The above-mentioned evidence, which constitutes more than a scintilla, is adequate to reasonably support the conclusion that plaintiff did not fully comply with the rehabilitative services deemed necessary by Sedgwick, and Sedgwick's denial of benefits on this basis was not arbitrary and capricious.

**B. <u>Disabled From Any Occupation</u>**

Plaintiff claims that Sedgwick also abused its discretion by denying plaintiff's LTD benefits despite evidence that she was disabled by her ongoing vertigo. Monsanto does not dispute plaintiff's vertigo or abnormal ENG. However, Monsanto contends that there is no medical evidence in the administrative record that plaintiff is "totally disabled from performing 'any reasonable occupation'" as defined by the Plan.

The Plan sets forth two definitions of disability for the purposes of determining eligibility for LTD benefits. After an employee has received LTD benefits for eighteen months, the definition broadens from an inability to perform the essential duties of the employee's **"OWN OCCUPATION"** to an inability "to perform, with or without reasonable accommodation, **ANY REASONABLE OCCUPATION** for which [the employee is] qualified or may become qualified by virtue of education, training or experience."[89]

Monsanto directs the Court to the opinions of multiple physicians who stated that plaintiff may return to work so long as

---

[89]Admin. Rec. Doc. Nos. 388-89 (emphasis in original).

she avoids climbing ladders, exposed machinery or operating a vehicle.[90] Dr. Mohnot advised Sedgwick in October, 2005 that plaintiff may perform sedentary work. Nonetheless, plaintiff insists that she is disabled, arguing that the fact that physicians restricted her from driving demonstrates that she cannot perform any other occupation.[91]

It is clear that Sedgwick did not abuse its discretion in determining that plaintiff could perform other reasonable occupations. As previously stated, four physicians released plaintiff to work despite a diagnosis of vertigo and dizziness. Three of the physicians identified restrictions, but none precluded her from working entirely. In light of medical opinions that plaintiff may perform work as long as it does not involve heavy lifting, climbing, or operating vehicles or machinery, it was not arbitrary and capricious for Sedgwick to determine that plaintiff is capable of performing another occupation.

Furthermore, any restrictions on plaintiff's ability to drive do not translate into an inability to work[92] and Sedgwick's decision

---

[90]Admin. Rec. Doc. Nos. 158, 213, 275, 326-27.

[91]Plaintiff directs the Court to a letter she wrote to Sedgwick, explaining that Monsanto would not offer her a job, scanning files, unless her doctor released the driving restriction. Her letter states, "If they won't offer me a position because of this fact then how do they expect me to be able to find another job?"Admin. Rec. Doc. No. 361.

[92]Even if there's no public transportation available near plaintiff's home, as plaintiff states in a letter included in the administrative record, there is no evidence that plaintiff had no means of transportation, such as using a taxi service or arranging a carpool.

25

to discontinue benefits despite this limitation is not arbitrary and capricious.[93] *See Nelson v. Unum Life Ins. Co.*, 421 F. Supp. 2d 558, 568 (E.D.N.Y. 2006)("It is clear that a claimant's commute to a particular job site is not a consideration for determining disability."); *Graham v. First Reliance Standard Life Ins.* Co., No. 04-9797, 2007 WL 2192399, at *7 (July 31, 2007 S.D.N.Y.); *Adams v. Prudential Ins. Co.*, 280 F. Supp. 2d 731, 739-40 (N.D. Ohio 2003)("The Court is unpersuaded by [plaintiff's] argument that his inability to travel to and from work is a material and substantial duty that Defendant must consider."); *Chandler v. Underwriters Lab, Inc.*, 850 F. Supp. 728, 738 (N.D. Ill. 1994); *Ross v. Prudential Ins. Co.*, No. 06-133, 2007 WL 581672 (E.D.Ky. Feb. 20, 2007)(finding that an administrator's denial of benefits to an employee who suffered seizures was not arbitrary and capricious despite physicians' restrictions against driving).

Additionally, the fact that GENEX conducted a transferable skills analysis and identified available occupations without considering all of plaintiff's medical records and restrictions does

_____

[93]The Plan's language indicates that as long as plaintiff is capable of *performing* any reasonable occupation, she does not qualify for LTD benefits. The words "qualified" and "perform" suggest that the focus of Sedgwick's assessment is on plaintiff's ability to work as opposed to all other factors that might influence plaintiff's work life, such as transportation to and from work. *Vercher*, 379 F.3d at 229 n.8 ("Eligibility for benefits under an ERISA plan is 'governed in the first instance by the plain meaning of the plain language.'" (quoting *Threadgill v. Prudential Secs. Group, Inc.*, 145 F.3d 286, 292 (5th Cir. 1998))); *see also Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1308 (5th Cir. 1994) (finding evidence that plaintiff can perform sedentary to light work sufficient to find plaintiff capable of performing any job). Plaintiff does not argue that she cannot *perform* another occupation, only that she cannot drive to the job site.

not indicate that Sedgwick's determination was arbitrary and capricious. Plaintiff contends that Sedgwick relied upon a flawed transferable skills analysis because Sedgwick did not provide GENEX with reports from physicians, i.e. Dr. Trahant and Dr. Turkewitz, indicating that she could not drive. However, GENEX did receive and consider Dr. Irwin's May, 2006 report restricting plaintiff from operating vehicles.[94]

For the same reason, the Court is not convinced that Sedgwick abused its discretion in light of a finding by an administrative law judge ("ALJ")with respect to plaintiff's claim for Social Security benefits that "there are no jobs in significant numbers in the national economy that claimant can perform."[95] The ALJ rejected the state medical consultant's opinion that plaintiff could perform medium work activity and considered the opinion of a vocational expert that frequent attacks of vertigo may affect plaintiff's reliability and dependency.[96] In light of evidence from physicians and a neuro-psychologist that plaintiff was capable of working,

---

[94]Admin. Rec. Doc. Nos. 278, 280. As Monsanto contends, the terms of the Plan do not require a skills analysis before assessing plaintiff's ability to perform any reasonable occupation. *See White*, 2005 WL 711607, at *7 ("The instant Plan does not call for the Plan Administrator to identify jobs within a certain are [sic], nor does it require the Plan Administrator to identify specific jobs at all."). In a case involving a similar definition of disability, the Fifth Circuit held that a plan administrator need not identify or guarantee the availability of other jobs when making a determination of disability. *Duhon*, 15 F.3d at 1309 ("[I]t was not an abuse of discretion for the plan administrator to conclude that [plaintiff] was capable of performing some type of occupation without obtaining the opinion of a vocational rehabilitation expert.").

[95]Admin. Rec. Doc. Nos. 375-76.

[96]Admin. Rec. Doc. No. 377.

Sedgwick's failure to follow this Social Security determination was not arbitrary and capricious.[97] *See Schexnayder*, 553 F. Supp. 2d 658; *White v. Cyprus Amax Minerals*, No. 04-1188, 2005 WL 711607, at *6 (E.D. La. Mar. 22, 2005)(Fallon, J.)("[I]t is not necessarily an abuse of discretion for an ERISA administrator to make a disability determination that conflicts with the benefit determination made by the Social Security Administration.").

Finally, the fact that plaintiff's treating physicians, Dr. Brunet and Dr. Sampognaro, advised Sedgwick that plaintiff should not return to work does not lead the Court to conclude that Sedgwick's denial of LTD benefits was arbitrary and capricious. A plan administrator need not defer to the opinion of an employee's treating physician. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 1972, 155 L. Ed. 2d 1034 (2003)("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician...."). Moreover, Dr. Brunet issued his opinion in December, 2004 and Dr. Sampognaro did so in July, 2005. Sedgwick did not terminate plaintiff's benefits until well over a year after the last opinion stating that she could not

---

[97]Although it is unclear which records the ALJ considered, his opinion does not reference the medical opinion of three of the physicians who evaluated plaintiff and determined that she could return to work. Admin. Rec. Doc. Nos. 371-77.

work. Notably, the physicians who conducted the most recent evaluations of plaintiff, including a physician to whom Dr. Sampognaro referred plaintiff,[98] stated that she could return to work with certain restrictions.

## CONCLUSION

For the foregoing reasons, the Court does not find that defendant abused its discretion in denying plaintiff's claim for LTD benefits.

Accordingly,

**IT IS ORDERED** that defendant's motion for summary judgment is **GRANTED** and that plaintiff's motion for summary judgment is **DENIED.**

**IT IS FURTHER ORDERED** that plaintiff's claims against Monsanto are **DISMISSED WITH PREJUDICE.**


New Orleans, Louisiana, April 7th ___, 2009.

                               LANCE M. AFRICK
                 UNITED STATES DISTRICT JUDGE

---

[98]Admin. Rec. Doc. Nos. 275-76.